O’Connor, C.J.,
dissenting.
{¶ 42} To achieve the result it desires in this case, the new majority reframes the question in such a way that it can be answered only in the affirmative: “The issue in this case is whether a probate court may exercise its exclusive jurisdiction over adoption proceedings while a juvenile court is concurrently exercising continuing jurisdiction over a child custody proceeding.” (Emphasis sic.) Majority opinion at ¶ 1.
{¶ 43} The actual question before us, however, is whether a probate court may exercise its exclusive jurisdiction over adoption proceedings while a juvenile court is exercising its exclusive jurisdiction over a child-custody proceeding. The *239 answer to this question is, as it was when we first considered this case, “no.” 146 Ohio St.3d 1404, 2016-Ohio-3255, 50 N.E.3d 571.
{¶ 44} As set forth in our rules, “A motion for reconsideration shall not constitute a reargument of the ease * * S.Ct.Prac.R. 18.02(B). But respondents, the Probate Division of the Mercer County Court of Common Pleas (“Probate Court”) and its judges Mary Pat Zitter and James Rapp, have offered no new fact or legal argument that we failed to consider initially and, accordingly, their motion for reconsideration should be denied. See, e.g., State ex rel. Shemo v. Mayfield Hts., 96 Ohio St.3d 379, 2002-Ohio-4905, 775 N.E.2d 493, ¶ 9; Toledo Edison Co. v. Bryan, 91 Ohio St.3d 1233, 1234, 742 N.E.2d 655 (2001) (Pfeifer, J., concurring).
{¶ 45} Without a word of explanation of how the onerous standard for granting a motion for reconsideration is met here, a majority of this court abandons this court’s prior ruling, grants the motion to reconsider, and rescinds our previous writ of prohibition against respondents so that the Probate Court may proceed with the adoption of the minor child, M.S., by nonparties Brian and Kelly Anderson.
{¶ 46} It is one thing to ignore the standard for reconsideration. It is far more dangerous and disheartening, however, for the majority to ignore the realities of adjudicating cases of child abuse or neglect in Ohio’s juvenile courts. Yet in its rush to permit the Andersons’ adoption of M.S., the majority presents an unprecedented holding under the guise of statutory analysis. That analysis supports the majority’s bottom line but casts aside every practitioner’s understanding of Ohio’s previously well-functioning juvenile court system, which must both protect dependent, neglected, and abused children and respect the fundamental constitutional rights of their parents.
{¶ 47} At best, the majority fails to understand the significant differences between the early stages of a child-abuse, neglect, or dependency action and the latter stages of such an action. The focus in the initial stages is on ascertaining whether the child has been imperiled and, if so, what orders must be entered immediately to protect the child. During the latter stages of the proceedings, the court must determine whether a parent’s misconduct contributed to the child’s peril and warrants the termination of the parent’s rights to continued custody and care of the child. See In re Bishop, 36 Ohio App.3d 123, 124, 521 N.E.2d 838 (5th Dist.1987) (noting that the focus of a dependency charge is on the child and the child’s conditions, and not on the child’s parents’ faults); Giannelli and Salvador, Ohio Juvenile Law, Section 43:2, at 578 (2015 Ed.).
{¶ 48} Before proceeding with an explanation of the failings of the majority’s statutory analysis and its sophistry with notions of juvenile and probate courts’ respective jurisdictions, I pause to address important factual points that are not *240 mentioned, let alone addressed, by the majority but that should inform our understanding of this case.
THE ANDERSONS’ MISREPRESENTATIONS
{¶ 49} On March 31, 2016, the Andersons filed a petition for the adoption of M.S., in the Mercer County Probate Court. They intentionally deceived, twice, in that application.[3]
{¶ 50} First, they asserted that M.S. “is living” in their home. In truth, M.S. was not living in the Andersons’ home on that date; the Allen County Children Services Board (“the Agency”) had removed M.S. from their home at least two weeks earlier, on or about March 16, 2016, and placed her with her aunt in Indiana.
{¶ 51} Second, the Andersons swore that M.S. had been placed in their home “for adoption” on August 7, 2014, by the Agency. In truth, M.S. had been placed in the Andersons’ home pursuant to an ex parte emergency custody order two weeks after M.S.’s birth.
{¶ 52} Notably, M.S.’s emergency placement with the Andersons was precipitated by the fact that M.S. had tested positive for cocaine shortly after her birth. That test result, of course, was due to the child abuse M.S. suffered from her mother’s use of cocaine during her pregnancy. See In re Baby Boy Blackshear, 90 Ohio St.3d 197, 736 N.E.2d 462 (2000), syllabus (a newborn baby who was exposed while a fetus to an illegal substance like cocaine is per se an abused child). Whether M.S.’s mother’s cocaine use was due to an inability to resolve an addiction or an unwillingness to abstain is not clear, but this was not her first experience with the juvenile court system due to concerns over her parenting.[4] Her misconduct with M.S. alone was enough to establish that M.S.’s mother was not a suitable parent, and there is no showing that she is now suitable even though parental suitability is a necessary prerequisite to custody. In re Perales, *241 52 Ohio St.2d 89, 369 N.E.2d 1047 (1977), syllabus; see Clark v. Bayer, 32 Ohio St. 299 (1877), paragraph one of the syllabus.
{¶ 53} In any event, there is not a scintilla of evidence in the record suggesting, yet alone establishing, that M.S. was placed with the Andersons with an eye toward adoption. Nor should there be.
{¶ 54} Significantly, at the time the Agency placed M.S. with the Andersons, it had an obligation to protect the child but work toward her reunification with her mother. In re C.F., 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28-33. And the Andersons, as foster parents, also were obliged to strive for reunification of mother and child. See In re R.W., 2015-Ohio-1031, 30 N.E.3d 254, ¶ 17 (8th Dist.) (noting that foster parents act as agents of the state). Instead, as the Juvenile Division of the Allen County Court of Common Pleas (“Juvenile Court”) found, the Andersons began “acting as independent free agents and well outside their role as caregivers,” by contemplating adoption of the child despite the Agency’s goal of placing M.S. in the legal custody of her aunt—a placement consistent with Ohio’s public policy favoring placement with a relative or family member over placement in foster care,[5] Ohio Adm.Code 5101:2-42-05(E) and (F).
{¶ 55} Notwithstanding M.S.’s mother’s parental unsuitability and per se abuse of M.S. or the fact that she retains only residual parental rights that do not permit her to control M.S.’s adoption, the majority nevertheless finds that her consent to the Andersons’ adoption of M.S. is sufficient to destroy the Juvenile Court’s exclusive jurisdiction and to permit the Probate Court to proceed with the Andersons’ adoption petition, even if it contains lies or, at best, self-defeating statements.[6]
{¶ 56} The tragedy wrought by the majority’s holding may or may not befall M.S. But it will certainly 'befall many of the neglected or abused children whom the law entrusts to our juvenile courts, the attorneys and guardians who *242 represent those children, and the judges who preside over their cases. That docket is not an insignificant one: last year, there were nearly 22,000 cases of abuse, neglect, or dependency on the dockets of Ohio’s juvenile courts. Supreme Court of Ohio, 2015 Ohio Courts Statistical Report 125, available at http://www.supremecourt.ohio.gov/Publications/annrep/15OCSR/2015OCSR.pdf (accessed Sept. 14, 2016).
ANALYSIS

The proper understanding of a juvenile court’s exclusive jurisdiction

{¶ 57} The majority’s analysis offends the General Assembly’s equipoise of two sometimes-competing fundamental rights: a parent’s right to the custody and care of her or his child and a child’s right to be free from abuse and neglect.
{¶ 58} The rights of a parent may be fundamental, but they are not absolute. Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944); In re Cunningham, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979). The state has broad authority to intervene to protect children from abuse and neglect. In re C.F., 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 28, citing R.C. 2151.01.
{¶ 59} As we have explained previously,
[ultimately, parental interests are subordinate to the child’s interest when determining the appropriate resolution of a petition to terminate parental rights. [Cunningham at 106.] [The child’s] private interest, at least initially, mirrors his mother’s, i.e., he has a substantial interest in preserving the natural family unit. But when remaining in the natural family unit would be harmful to him, [the child’s] interest changes. His private interest then becomes a permanent placement in a stable, secure, and nurturing home without undue delay. See In re Adoption of Zschach, 75 Ohio St.3d 648, 651, 665 N.E.2d 1070 (1996). “There is little that can be as detrimental to a child’s sound development as uncertainty over whether he is to remain in his current ‘home,’ under the care of his parents or foster parents, especially when such uncertainty is prolonged.” Lehman v. Lycoming Cty. Children’s Servs. Agency, 458 U.S. 502, 513-514, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982).
In re B.C., 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 20.
{¶ 60} Because “[p]ermanent termination of parental rights has been described as the ‘family law equivalent of the death penalty in a criminal case,’ ” parents *243 “ ‘must be afforded every procedural and substantive protection the law allows’ ” before termination of a parent’s rights. In re Hayes, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), quoting In re Smith, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991). The General Assembly thus crafted an extensive and strict structural framework in the Revised Code for juvenile courts to follow in making a termination decision. In re Z.R., 144 Ohio St.3d 380, 2015-Ohio-3306, 44 N.E.3d 239, ¶ 20 (“The General Assembly has made clear that the central purpose of the juvenile court system is ‘[t]o provide for the care, protection, and mental and physical development of children’ ”), quoting R.C. 2151.01(A); In re T.R., 52 Ohio St.3d 6, 15, 556 N.E.2d 439 (1990) (“The mission of the juvenile court is to act as an insurer of the welfare of children and a provider of social and rehabilitative services”); Children’s Home of Marion Cty. v. Fetter, 90 Ohio St. 110, 127, 106 N.E. 761 (1914) (recognizing that the legislature established the juvenile courts “in order to protect children”). The process of adjudicating a child-welfare case ensures the graduated restriction of parental rights in cases in which it is necessary to do so, typically starting with protective supervision of the child at home, then removal and temporary custody of the child outside the home.
{¶ 61} The process begins with the filing of the dependency complaint, which triggers the exclusive original jurisdiction of the juvenile court to adjudicate cases involving any child alleged to be abused, neglected, or dependent.[7] In re Z.R. at ¶ 16; State ex rel. Jean-Baptiste v. Kirsch, 134 Ohio St.3d 421, 2012-Ohio-5697, 983 N.E.2d 302, ¶ 18, citing R.C. 2151.23(A)(1).
{¶ 62} Within 30 days of the filing of the complaint, the juvenile court must conduct an adjudicatory hearing to determine whether the child is abused, neglected, or dependent and whether the child should remain in (or be placed in) shelter care. R.C. 2151.28(A)(2) and (B). And the court must hold an additional hearing no more than 30 days after the adjudicatory hearing. R.C. 2151.35(B)(1).
{¶ 63} The court then has seven days in which to issue a judgment that includes one of six temporary or interim disposition orders, see R.C. 2151.353(A)(1) through (6). R.C. 2151.35(B)(3). Here, the Juvenile Court entered such an order by giving temporary custody of M.S. to the Agency.[8]
{¶ 64} R.C. 2151.353 expressly confers to the juvenile court the authority to “commit the child to the temporary custody of’ a children-services or private *244 child-placing agency. (Emphasis added.) R.C. 2151.353(A)(2). Despite the fact that the Juvenile Court’s order is for only temporary custody, the majority holds that the Juvenile Court’s exclusive jurisdiction terminated at that point, and will always terminate at that point, regardless of which dispositional order a juvenile court elects. But the majority’s conclusion is entirely arbitrary. Based on the analysis the majority proffers, the majority could just as easily have concluded that the juvenile court loses exclusive jurisdiction when it completes the adjudicatory hearing and declares the child dependent.
{¶ 65} Both conclusions are incorrect. In either scenario, the majority deprives the juvenile court of its exclusive jurisdiction to do the critical work the General Assembly charged to it—ensuring the safe care of the child—before that critical work is complete. The General Assembly plainly did not intend this result, because the scheme it created and placed in the Revised Code considers the final dispositional order in the abuse, neglect, or dependency case to be the judgment ending the juvenile court’s adjudicatory process.
{¶ 66} A temporary-custody order is an interim disposition intended to serve only as a temporary, rather than final, disposition. We know this because the statutory language specifies that the temporary-custody order terminates one year after the complaint’s filing or the child’s placement in shelter care, whichever is earlier, R.C. 2151.353(G); that the agency receiving temporary custody must file, no later than 30 days before the temporary-custody order (or an extension) expires, a motion in the juvenile court seeking one or more final dispositional orders for the child, R.C. 2151.415(A); and that the juvenile court must schedule a hearing on the motion for final disposition in the very same dispositional order that creates the temporary custody, nearly a year before the hearing will occur, R.C. 2151.35(B)(3).
{¶ 67} In its rush to permit the Probate Court to assert its exclusive jurisdiction over a case pending in juvenile court, the majority ignores that temporary dispositions in juvenile court are just that: temporary, i.e., “not a determination of the merits of the complaints, but a temporary order pending determination of the merits of the complaint,” In re Spears, 4th Dist. Athens No. 1200, 1984 WL 5682, *4 (Dec. 10, 1984). See also Black’s Law Dictionary 1131 (8th Ed.2004) (defining “temporary order” as a “court order issued during the pendency of a suit, before the final order or judgment has been entered”). Those interim orders serve as temporal and substantive guideposts along the path of adjudicating parental rights in neglect and abuse cases, not final orders that resolve the rights of the parent and the child.
{¶ 68} The majority seizes on the fact that those guideposts are referred to as “dispositions” to summarily declare, without authority, that “[t]he retained jurisdiction following a dispositional order issued pursuant to R.C. 2151.353(A)— *245 including an order of temporary custody under R.C. 2151.353(A)(2)—is ‘continuing jurisdiction,’ R.C. 2151.417(B), subject to termination by an adoption decree.” Majority opinion at ¶ 22. In so holding, the majority ignores that the General Assembly extensively revised its statutory scheme in the late 1980s to provide specific deadlines for holding shelter-care, adjudicatory, dispositional, and other hearings in cases of child abuse, neglect, or dependency in order to protect children from languishing needlessly in the foster-care system. As one appellate court explained,
[bjecause of apparent dissatisfaction with the results of prior legislative efforts and in order to ensure Ohio’s compliance with federal mandates, the General Assembly enacted Am.Sub.S.B. No. 89, effective January 1, 1989 (142 Ohio Laws, Part I, 198), which provided comprehensive changes in the laws governing neglect, dependency, and abuse proceedings. Kurtz & Giannelli, Ohio Juvenile Law (2 Ed.1989) 21, T 1.04. The overall intent of the legislation was to prevent “foster care drift” by, among other things, establishing maximum time limits under which children may remain in the custody of public and private child care agencies, and increasing the responsibilities of juvenile courts to review and oversee the permanency planning efforts of these agencies. Id. at 22; see, also, Legislative Service Commission Analysis of Am.Sub.S.B. 89, Baldwin’s 1988 Laws of Ohio, at 5-5.71.
In re Collier, 85 Ohio App.3d 232, 235, 619 N.E.2d 503 (4th Dist.1993). See also In re Murray, 52 Ohio St.3d 155, 157-158, 556 N.E.2d 1169 (1990) (describing “the sweeping reforms made to the juvenile court system” by Am.Sub.S.B. No. 89, including amendments to R.C. 2151.353).
{¶ 69} The majority’s conclusion that the Juvenile Court judges’ interim dispositional orders end the Juvenile Court’s exclusive, original jurisdiction is not supported by the legislative history of the 1989 amendments.
{¶ 70} Granted, there is an unfortunate lack of precision in the use of the term “disposition” in the legislative history, in which the term is used to denote both initial and final dispositions. See, e.g., Legislative Service Commission Analysis of Sub.S.B. 89, as reported by H. Children & Youth (1989), at 21 and 37; Legislative Service Commission Analysis of Sub.S.B. 89, as passed by the Senate (1989), at 2 and 11-12. Given that lack of clarity, we should interpret the statute consistently with its purpose and with common sense and hold that the General Assembly intended that a juvenile court’s final dispositional hearing and subsequent ruling serves as the culminating event that extinguishes a juvenile court’s exclusive jurisdiction, and not the interim dispositions reflected in the juvenile *246 court’s temporary-custody orders.[9] After all, the final dispositional order of a juvenile court is the only order that could terminate parental rights and give rise to making a child available for adoption. (Here, of course, the Juvenile Court has not determined the status of the mother’s rights to M.S.)
{¶ 71} Moreover, the majority ignores the significance of the very specific manner in which the statutory provisions it relies on were drafted, including the General Assembly’s express mention of R.C. 2151.414 and 2151.415 in R.C. 2151.417(B).
{¶ 72} R.C. 2151.417(B) provides that if a juvenile court “issues a dispositional order pursuant to R.C. 2151.353, 2151.414, or 2151.4-15, the court has continuing jurisdiction over the child” until the child turns 18 or is adopted. (Emphasis added.) See R.C. 2151.353(F)(1). The juvenile court necessarily must have continuing jurisdiction for purposes of determinations made under the authority of R.C. 2151.353(F) in order to permit the juvenile court to continue considering the family—including the biological parents’ progress with parenting skills that could lead to reunification with them child—before rendering a final disposition about the care and custody of the child.
{¶ 73} But what, then, is the relevance of R.C. 2151.414 and 2151.415? Under the majority’s interpretation of the statute, there was no reason for the General Assembly to have referred to R.C. 2151.414 and 2151.415 in R.C. 2151.417(B) because children subject to orders issued under R.C. 2151.414 and 2151.415 would already be subject to the juvenile court’s continuing jurisdiction by operation of the temporary orders issued under R.C. 2151.353. The majority’s analysis ignores the General Assembly’s express mention of R.C. 2151.414 and 2151.415 in R.C. 2151.417(B).
{¶ 74} When construing a statute, we must give effect to all the enacted language. Church of God in N. Ohio, Inc. v. Levin, 124 Ohio St.3d 36, 2009-Ohio-5939, 918 N.E.2d 981, ¶ 30. As we explained in Boley v. Goodyear Tire & Rubber Co., a construction that renders statutory words meaningless and without effect is *247 an improper analysis. 125 Ohio St.3d 510, 2010-Ohio-2550, 929 N.E.2d 448, ¶ 21 (noting that the court’s role is to evaluate a statute as a whole and interpret the statutory language in a way that gives effect to every word and clause in it, not treat any part as superfluous, and to avoid a construction that renders a provision meaningless or inoperative). See also Weaver v. Edwin Shaw Hosp., 104 Ohio St.3d 390, 2004-Ohio-6549, 819 N.E.2d 1079, ¶ 13, citing Wachendorf v. Shaver, 149 Ohio St. 231, 78 N.E.2d 370 (1948), paragraph five of the syllabus (statutes “may not be restricted, constricted, qualified, narrowed, enlarged or abridged; significance and effect should, if possible, be accorded to every word, phrase, sentence and part of an act”).
{¶ 75} To be sure, the statutory scheme at issue here is labyrinthine. But the complexity of the statutes is not an invitation to import our own judicial philosophies and preferences into the analysis. “ ‘ “A court should not place a tenuous construction on [a] statute to address a problem to which the legislative attention is readily directed and which it can readily resolve if in its judgment it is an appropriate subject of legislation.” ’ ” State v. Gray, 62 Ohio St.3d 514, 518, 584 N.E.2d 710 (1992), quoting People v. Hardy, 188 Mich.App. 305, 310, 469 N.W.2d 50 (1991), quoting People v. Gilbert, 414 Mich. 191, 212-213, 324 N.W.2d 834 (1982).
{¶ 76} Rather, our duty is to construe the statutes according to legislative intent, harmonizing them in a proper and reasonable fashion and giving the provisions their proper force and effect. State v. South, 144 Ohio St.3d 295, 2015-Ohio-3930, 42 N.E.3d 734, ¶ 29 (O’Connor, C.J., concurring), citing D.A.B.E., Inc. v. Toledo-Lucas Cty. Bd. of Health, 96 Ohio St.3d 250, 2002-Ohio-4172, 773 N.E.2d 536, ¶ 20; State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn., 74 Ohio St.3d 543, 545, 660 N.E.2d 463 (1996); and State ex rel. Pratt v. Weygandt, 164 Ohio St. 463, 132 N.E.2d 191 (1956), paragraph two of the syllabus.
{¶ 77} The General Assembly, having established a specific and mandatory process for both initial decisions about the protection of the child and those finalizing a juvenile court’s judgment, clearly extended the juvenile court’s exclusive jurisdiction through to the end of the juvenile court’s adjudication process.[10] At that point, the juvenile court has continuing, but not exclusive, jurisdiction over the child. Neither a probate court nor a litigant in the probate court can deprive a juvenile court of its exclusive jurisdiction before final disposition. State ex rel. Hitchcock v. Cuyahoga Cty. Court of Common Pleas, Probate Div., 97 Ohio App.3d 600, 604, 647 N.E.2d 208 (8th Dist.1994) (“If a court *248 has exclusive jurisdiction over a proceeding, it is difficult to imagine how another court may divest it of the authority to hear such a proceeding”).

The proper understanding of a probate court's exclusive jurisdiction

{¶ 78} There is no dispute that the probate courts have exclusive original jurisdiction over adoption proceedings. In re Adoption of Pushcar, 110 Ohio St.3d 332, 2006-Ohio-4572, 853 N.E.2d 647, ¶ 9; State ex rel. Otten v. Henderson, 129 Ohio St.3d 453, 2011-Ohio-4082, 953 N.E.2d 809, ¶ 21; State ex rel. Portage Cty. Welfare Dept. v. Summers, 38 Ohio St.2d 144, 311 N.E.2d 6 (1974), paragraph two of the syllabus.
{¶ 79} The process of adoption begins with the filing of a petition for adoption. R.C. 3107.05(A). Subject to exceptions, an adoption petition must be filed no later than 90 days after the date the minor is placed in the home of the person seeking to adopt the minor. R.C. 3107.051(A).
{¶ 80} The majority emphasizes that preadoption placement (that is, placement of the child before the final order of adoption) is governed by R.C. 5103.16(D). That section establishes a general rule that adoption placements must be made by a public children-services agency or other certified agency, subject to an exception: prior to the placement of the child, the parent or parents of the child may petition the probate court for approval of a specified placement, and if certain conditions are met, the probate court may order the placement. R.C. 5103.16(D)(1) through (3). “If the court approves a placement, the prospective adoptive parent with whom the child is placed has care, custody, and control of the child pending further order of the court.” R.C. 5103.16(D).
{¶ 81} The majority seizes on this statutory scheme and summarily concludes that it is sufficient to permit the Probate Court to proceed with M.S.’s adoption. And that might have been the case if M.S.’s mother had legal custody of M.S., because legal custody includes the right to control how and where a child shall live. R.C. 2151.011(B)(21). But M.S.’s mother does not have legal custody; she possesses only the residual rights set forth in R.C. 2151.011(B)(49), including the right to consent to an adoption.
{¶ 82} The right to consent to an adoption is not a right to control placement of the child pending adoption. Rather, it is a legislatively crafted protective measure that ensures that no adoption can be initiated without a biological parent’s consent as long as a court of competent jurisdiction has not permanently terminated that parent’s parental rights. For this reason, the consent of a biological parent with residual parental rights is, for a probate court, a jurisdictional prerequisite. R.C. 3107.06; McGinty v. Jewish Children’s Bur., 46 Ohio St.3d 159, 161, 545 N.E.2d 1272 (1989). But M.S.’s mother cannot unilaterally *249 vest the Probate Court with jurisdiction it otherwise lacks merely by consenting to an adoption. See In re Palmer, 12 Ohio St.3d 194, 197, 465 N.E.2d 1312 (1984).
{¶ 83} I would hold, consistent with Palmer, that as long as a temporary-custody order is in effect, the parent of a child who has been declared dependent has no legal authority to direct the child’s placement, whether by consenting to an adoption, a preadoption placement, or otherwise. Nevertheless, the judicial fiat rendered by the majority today expands the scope of residual parental rights, which evidently now permit a parent to control placement of the child and to divest a juvenile court of its exclusive jurisdiction to adjudicate a complaint that the parent abused or neglected her or his child.
{¶ 84} The majority does not cite a single case that actually supports that result.[11] The paucity of authority is not surprising, however, because until today, no such authority existed.
CONCLUSION
{¶ 85} From this day forward, parents who face termination of their parental rights due to their suspected abuse or neglect of their children need not worry. To avoid the intruding eye of the juvenile court judge, the parent alleged to be abusive or neglectful can simply find a trusted ally or private adoption agency, then proceed to probate court, where the adoption can occur without any finality to the allegations of abuse or neglect. And once the adoption is final, nothing can be done to protect the child except, of course, return to juvenile court on a new dependency action. But child-protective services would be no more successful there than the daughters of Danaus for, upon arrival in juvenile court to face the allegations of abuse or neglect, the parent could simply abscond to probate court and again avoid adjudication.
{¶ 86} The majority’s holding promotes the precise sort of turf war that has occurred in this case, to the detriment of M.S. We should be cognizant that we previously adopted as our own the words of then Judge O’Neill, albeit in a *250 slightly different context, when he cautioned against permitting courts to be playing fields in which children are the pawns:
The current litigation at this appellate level is not about good parents or bad parents. Further, this court is also not determining custody, an issue to be decided later by a court with competent jurisdiction. Rather, this court has a very solemn role to play, and that is to determine which court * * * has jurisdiction over this matter. As this case demonstrates, the best interest of a child is never served when adults turn to seemingly endless litigation to resolve their disputes. In this case, the parties have staked out a position and have waited for the courts to schedule hearings where it is hoped that the Wisdom of Solomon will come down on the winning side. In the interim, the life of a child and two families are left in turmoil and uncertainty to no one’s benefit. Litigation of these matters is already difficult when one court in one state is involved in the controversy. It becomes unwieldy when multiple [courts] become embroiled in the dispute and cannot agree on the basic issue of jurisdiction.
In re Adoption of Asente, 90 Ohio St.3d 91, 91-92, 734 N.E.2d 1224 (2000).
{¶ 87} The memories of the justices in the majority are evidently as limited as the majority opinion’s analysis here.
{¶ 88} I dissent.
O’Neill, J., concurs in the foregoing opinion.

. Standard Probate Form 18.0, Petition for Adoption of Minor, issued per Sup.R. 51, is in use in Mercer County. The petition form asks for the identity of the party -with permanent custody as well as the name of the attorney who represented the minor and the name of the guardian ad litem in the permanent-custody proceedings, suggesting that the form was drafted with the expectation, that an adoption petition will not be filed until a permanent-custody order is in place. The Andersons avoided this problem by striking through the word “permanent” on their petition and typing above it “temporary.” This unilateral rewording of the adoption petition did nothing to change the requirement that a permanent-custody order be presented in order to show capacity to place the child and inform the probate court as to whose consent is necessary to an adoption.

. Although the circumstances are not before us, a West Virginia court previously awarded custody of M.S.’s half-sibling to M.S.’s aunt, who currently has physical custody of M.S.

. On November 13, 2015, the Andersons moved to be made parties to the Juvenile Court ease and for legal custody of M.S. On the same day, M.S.’s mother expressed her consent to intervention by the Andersons and voiced objection to any plan that would place M.S. in the care or custody of M.S.’s aunt. The Juvenile Court expressed concern that the Andersons, who as foster parents serve as agents of the Agency, were improperly “acting as independent free agents and well outside their role as caregivers” by hiring a private investigator, retaining a psychologist to offer expert testimony, and contemplating adoption of the child fostered with them despite the Agency’s goal of placing the child in the legal custody of her aunt. The Juvenile Court properly denied the Andersons’ motion to intervene, because “[fjoster parents have no right under the rules of juvenile procedure to participate as parties in the adjudication of the rights of natural parents.”

. At a minimum, the petition filed in the Probate Court cannot serve as the petition that would actually grant adoption to the Andersons because it was untimely. R.C. 3107.051(A) (requiring that adoption petitions generally be filed within 90 days after the child is placed in the petitioner’s home).

. A dependent child is “essentially [one] whose ‘condition or environment is such as to warrant the state, in the interests of the child, in assuming [the child’s] guardianship.’ ” State ex rel. Easterday v. Zieba, 58 Ohio St.3d 251, 254, 569 N.E.2d 1028 (1991), fn. 1, quoting R.C. 2151.04(C).

. The Agency filed a dependency complaint on M.S.’s behalf on August 11, 2014. The Juvenile Court declared her to be dependent and abused on October 8, 2014. On November 4, 2014, following a hearing, the court ordered M.S. placed in the temporary custody of the Agency.

. Our appellate courts often distinguish between the preliminary dispositions of temporary custody of the child as orders of “temporary disposition” rather than as final adjudications. (Emphasis added.) E.g., In re S.W.E., 8th Dist. Cuyahoga No. 91057, 2008-Ohio-4234, 2008 WL 3870667, ¶ 12; In re A.D., 8th Dist. Cuyahoga No. 87510, 2006-Ohio-6036, 2006 WL 3318059, ¶ 11 and 16; In re S.G. & M.G., 8th Dist. Cuyahoga No. 84228, 2005-Ohio-1163, 2005 WL 616115, ¶ 9-13 and 19; In re Hale, 2d Dist. Clark No. CA2163, 1986 WL 554, *3 (Oct. 16, 1986); In re Miller, 1st Dist. Hamilton No. C-830919, 1984 WL 7022, *1 (Oct. 24, 1984); In re Parker, 3d Dist. Van Wert No. 15-79-16, 1981 WL 6774, *1 (Jan. 26, 1981); In re Feiler, 1st Dist. Hamilton No. C-780549, 1979 WL 208767, *2 (Oct. 17, 1979). And our juvenile courts similarly characterize an initial custody ruling as a “temporary disposition,” e.g., In re A.A., 8th Dist. Cuyahoga No. 85002, 2005-Ohio-2618, 2005 WL 1245620, ¶ 23, or as “pre-dispositional,” e.g., In re Hennen, 11th Dist. Trumbull No. 2002-T-0028, 2002-Ohio-7282, 2002 WL 31886716, ¶ 10.

. To be sure, interim dispositional orders may terminate a juvenile court’s exclusive jurisdiction, depending on the order, see R.C. 2151.353(A)(5) and (6), but only in limited cases.

. Although the majority suggests that Pushcar, 110 Ohio St.3d 332, 2006-Ohio-4572, 853 N.E.2d 647, and In re G.T.B., 128 Ohio St.3d 502, 2011-Ohio-1789, 947 N.E.2d 166, support its analysis, that suggestion is dubious. If those eases stand for the proposition that a probate court must refrain from proceeding with an adoption while there is a question of parentage, how can they not support the notion that a probate court must refrain from proceeding with an adoption when there is a question of the parent’s rights to the child? The result of this case would be the same under Pushear: resolution of the three motions pending before the Juvenile Court will have a significant impact on the parental rights of M.S.’s biological mother, and therefore they concern the parentage of M.S.